## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Melissa Kathleen B., <br><br>                        Plaintiff, <br><br> v. <br><br> Kilolo Kijakazi, Commissioner of Social Security, <br><br>                    Defendant. | Case No. 20-cv-2115 (ECT/HB) <br><br><br> **REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Melissa Kathleen B. seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). This matter is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 26, 31], which were referred to the undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and the Commissioner's motion be granted.

## I.    Background

### A.    Procedural History

Plaintiff filed an application for DIB on November 24, 2017, alleging a disability

onset date of September 2, 2017. (R. 254-60.)[1] The application was denied initially (R.

119-40) and upon reconsideration (R. 143-68). Plaintiff timely requested a hearing

before an ALJ. (R. 189-90.) The ALJ convened an in-person hearing in Minneapolis,

Minnesota, at which Plaintiff and vocational expert Beverly E. Solyntjes testified. (R. 58-

117.)

On August 17, 2020, the ALJ issued a partially favorable written decision finding

Plaintiff was disabled beginning June 5, 2019, but was not disabled from September 2,

2017, through June 4, 2019. (R. 6-43.) The Appeals Council denied Plaintiff's request

for review, which made the ALJ's decision the final decision of the Commissioner.

(R. 1-4.) Plaintiff then filed this action for judicial review.

**B.    Relevant Medical Records and Other Evidence**

The Plaintiff and the Commissioner adopted and incorporated by reference the

recitation of the facts set forth by the ALJ. (Pl.'s Mem. Supp. Mot. Summ. J. at 5 [ECF

No. 27]; Def.'s Mem. Supp. Mot. Summ. J. at 2 [ECF No. 32].) Likewise, the Court

adopts and incorporates the ALJ's recitation of the medical and vocational facts (R. 12-

42). The Court will include the relevant facts as necessary in the discussion of each

issue.

**C. Hearing Testimony**

Among numerous other impairments, Plaintiff was diagnosed with major

depression and fatigue, fibromyalgia, migraines, and Ehlers-Danlos syndrome ("EDS"),

---

[1] The administrative record (R.) is located on the docket at ECF No. 25.

hypermobile type.  (R. 64-69, 74, 92.)  EDS causes Plaintiff's ligaments to become loose and the joints to dislocate.  (R. 76.)  The muscles get extremely tight, spasming to hold her body together.  (*Id.*)  It is a degenerative disease without a cure.  (R. 75.)  At the hearing on December 13, 2019, Plaintiff testified about her vocational, educational, and medical history.

Plaintiff received an undergraduate degree in psychology and Spanish.  (R. 70.) She obtained a master's in marriage and family therapy with an additional certificate in sex and gender therapy.  (*Id.*)  Her condition deteriorated significantly while she was finishing her graduate schooling in the fall of 2015.  (R. 73.)  In the summer of 2016, she worked as an adjunct professor teaching an online course.  (R. 74.)  She took a major medical leave from the program.  (R. 73-74.)  After graduating, she worked as a family counselor.  (R. 70.)  Less recently, she worked as a membership sales associate and as a customer service representative for the YMCA.  (R. 72-73.)

Treatment for Plaintiff's EDS involves physical therapy, occupational therapy, and pool therapy, but Plaintiff testified to finding limited success.  (R. 75-76.)  Plaintiff's doctors increased her pain medication as her tolerance increased.  (R. 89-90.)  At the time of the hearing, she testified to wearing a 25 microgram per hour Fentanyl patch to deal with the pain.  (R. 76.)  She also took up to six tablets of 15 milligrams of morphine per day, however she stated that she would be weaned-off to prepare for a future surgery.  (R. 77.)  She required additional pain medications or treatments including divalproex, mirabegron, Botox injections dihydroergotamine mesylate, some of which were for her migraine pain specifically.  (R. 91-93; *see also* R. 398-400 (list of current medications).)

3

Plaintiff testified she was currently compliant with her drug treatment and denied taking any un-prescribed marijuana or opioid medicine, although she acknowledged that in the past, she had taken more than prescribed and had signed a contract to be on the restricted pharmacy list. (R. 80-81; *see also* R. 1252 (describing history of polypharmacy abuse).) Plaintiff's current drug treatment causes some cloudiness, difficulty in concentration, appetite suppression, and increased need for sleep. (R. 82.)

Plaintiff presented at the hearing with several assistive devices. Plaintiff was in a reclining wheelchair, which she began using in February 2018. (R. 77-78.) She testified that when she is at home, she uses a cane for mobility rather than the wheelchair, so as to avoid muscle atrophy. (R. 78.) Although the wheelchair was never prescribed for her, she purchased it based on recommendations by her many physical therapists. (R. 88.)

Plaintiff also wore several therapeutic devices on her index, middle, and ring fingers and wrists that brace her joints so that they do not hyperextend. (R. 83-85.) She testified she has several more braces that fit over her pinky, thumb, and the top knuckle of the index, middle, and ring fingers. (R. 85.) However, EDS causes easy bruising, meaning she can only where the braces for a few hours each day. (*Id.*) When Plaintiff's counsel asked whether Plaintiff, with the braces, could use her hands for things like feeling, fingering, and handling for two-thirds of a day, Plaintiff said no. (R. 86.) She testified to being able to do it a couple hours a day, but not every day, and that her ability to feel, finger, and handle would vary from day to day. (*Id.*) She testified she used her smartphone daily but that it was "sometimes too much." (R. 87.)

Plaintiff testified that she also suffers from migraines. She has no fewer than

seven "bad" migraines a month, which last between thirty minutes and eight hours. (R. 93-94.) Plaintiff responded to bad migraines by lying down and eliminating all noise and lights. (*Id.*) The migraines were worse and more frequent prior to medication. (R. 94-95.)

Plaintiff believed she would be unable to perform any job even if her only diagnosis was EDS because she would be unable to sit or lie down for any extended period of time. (R. 96.) Furthermore, the inability to predict symptoms and spikes in pain or fatigue would make it impossible to keep a consistent schedule. (*Id.*) In addition, she went to medical appointments on average twice a week, which would interfere with a work schedule, especially since she is unable to do anything else on those days due to fatigue. (R. 98-99.) Plaintiff testified that her absences caused issues with her past employers. (R. 100.)

Vocational expert Beverly Solyntjes also testified at the hearing. The ALJ presented several hypotheticals. First, the ALJ inquired about a hypothetical individual of Plaintiff's age, education, and past work, limited to: sedentary work, no use of foot control with either the left or right feet, occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, no balancing, occasional stooping, occasional kneeling, occasional crouching, occasional crawling, no work at unprotected heights, no work near moving mechanical parts such that a loss of balance in proximity of that machinery would pose a severe safety hazard to life or limb, no exposure to humidity and wetness, well-ventilated HVAC controlled setting, no indoor or outdoor work requiring direct exposure to concentrated sources of pulmonary irritants, no exposure to extremes

of cold or heat, no use of hand power tools or similar and prolonged physical contact with heavy vibrating machinery, simple, routine and repetitive tasks and using judgment limited to simple work related decisions, no interaction with the general public, occasional interactions with supervisors and coworkers such that work is rated no lower than eight on the people scale of appendix B. (R. 104-05.) When asked whether such a hypothetical person could perform Plaintiff's past work, the vocational expert said no, but that such a person could perform jobs such as document preparer, semiconductor bonder, or touchup screener for printed circuit boards. (R. 105.) Solyntjes testified that those jobs do not have interaction with the general public and would not require foot controls. (R. 105.) The ALJ posed a second hypothetical including the previous limitations but also that the individual would have the option to use a cane for stability when walking. (R. 106.) Solyntjes testified that the second hypothetical individual could still perform the aforementioned jobs based on her experience. (*Id.*) In the third hypothetical, the ALJ modified the assistive device to require the use of a cane for any change of position or standing or walking and added that the individual would require a wheelchair that reclines if the individual is sitting more than twenty minutes. (*Id.*) The vocational expert testified that the third hypothetical individual could not engage in any competitive employment, including the aforementioned jobs. (R. 106-07.)

Counsel for Plaintiff asked whether a person who needed to elevate his or her legs at least parallel to the ground while sitting would be tolerated. (R. 107-08.) Solyntjes said no, even for sedentary work. (R. 108.) Counsel inquired into whether an individual with the limitations identified in the first hypothetical that also had a limitation of only

6

occasional fingering could still perform the aforementioned jobs, to which Solyntjes said

it would eliminate those jobs and all other competitive work.  (R. 109.)  The same would

be true for a limitation of only occasional handling.  (*Id.*)

When asked about absenteeism and off-task behavior, Solyntjes testified that

employers tolerate up to one absence per month and off-task behavior for 10% of the

time in addition to regular breaks.  (R. 107.)  Absenteeism included coming in late and

leaving early.  (R. 110.)  Solyntjes agreed with Plaintiff's counsel that a person who did

not work when the employer expected them to work three times a week for as little as

twenty-four minutes each period would not be able to engage in competitive

employment.  (R. 109-110.)  Plaintiff's counsel asked about whether an employer would

tolerate an employee who had to attend medical appointments once a week for between

one to three hours.  (R. 110-11.)  Solyntjes believed it could be accommodated, but it

might not be tolerated. (R. 111.)  She testified similarly when asked whether an employer

would tolerate absences twice a month for medical appointments.  (R. 111-12.)  She

further clarified that she is unable to determine whether there are any competitive jobs

available for such absentee employees.  (R. 113.)  Finally, Solyntjes testified that there is

no competitive work available for an individual that would need to take an unscheduled

thirty-minute break once a week, such as a person suffering frequent migraines.  (*Id.*)

### D.    The ALJ's Decision

The ALJ issued a partially favorable decision on February 3, 2020, concluding that

Plaintiff was not disabled between September 2, 2017, and June 4, 2019, but that Plaintiff

was disabled from June 5, 2019, to the date of the decision.  (R. 11.)  In arriving at this

decision, the ALJ utilized the five-step sequential analysis described in 20 C.F.R. § 404.1520(a)(4).[2]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 2, 2017.  (R. 12.)  At step two, the ALJ found that Plaintiff had the following severe impairments: chronic fatigue syndrome, EDS, Raynaud's syndrome, chronic pain syndrome, fibromyalgia, irritable bowel syndrome, multi-level cervical spondylosis with dynamic dorsal disc protrusions with ventral cord flattening at C5-6 and C4-5, mild right hip dysplasia, post-traumatic stress disorder, recurrent and severe major depression, and moderate generalized anxiety disorder.  (R. 12-13.)  The ALJ determined the Plaintiff had several medically determinable impairments that were not severe:  orthostatic intolerance borderline for full diagnosis of postural orthostatic tachycardia syndrome intolerance, tinnitus, disorder of vision, concussion sequelae, post-traumatic syrinx, migraine headaches, and cannabis dependence.  (R. 13.)  Other impairments considered by the ALJ were found to be not medically determinable, symptoms of medically determinable impairments, transient impairments, or impairments that do not cause more than minimal functional impact.  (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20

---

[2] The five steps are (1) whether the claimant's work activity was substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(i)–(v).

C.F.R. part 404, subpart P, appendix 1 since September 2, 2017.  (R. 14-15.)  The ALJ

specifically considered whether Plaintiff's physical impairments met or equaled the

criteria of listings 1.02 (musculoskeletal disorders – major dysfunction of a joint (due to

any cause)), 1.04 (disorders of the spine or spinal cord), 11.14 (peripheral neuropathy),

14.06 (undifferentiated and mixed connective tissue disease), or digestive system

impairments (sections 5.02-5.09).  (R. 14-16.)  The ALJ also considered whether

Plaintiff's mental impairments met or equaled the criteria of listings 12.04 (depressive,

bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or

12.15 (trauma-and stressor-related disorders).  (R. 16-17.)

Between steps three and four, an ALJ must determine the claimant's RFC.[3]  20

C.F.R. § 404.150(e).  Here, the ALJ found that Plaintiff, prior to June 5, 2019, could

perform sedentary work with the following limitations:

> No use of foot controls with either foot; occasional climbing of ramps and
> stairs; no climbing of ladders, ropes or scaffolds; no balancing as that term
> is defined in the Selected Characteristics of Occupations (SCO); occasional
> stooping; occasional kneeling; occasional crouching; occasional crawling;
> no work at unprotected heights, no work near moving mechanical parts (the
> kind of moving machinery such that a loss of balance in proximity to that
> machinery would pose a severe safety hazard to life or limb); no exposure
> to humidity and wetness; regarding dust odors, fumes and pulmonary
> irritants, any indoor work would be in well-ventilated, HVAC-controlled
> settings; no indoor or outdoor work requiring direct exposure to
> concentrated sources of pulmonary irritants; no exposure to extremes of
> cold or heat; regarding vibrations, no use of hand power tools or similar
> direct and prolonged physical contact with heavy vibrating machinery;
> limited to performing simple, routine and repetitive tasks; and using
> judgment to perform simple work-related decisions; no interaction with the

---

[3] The RFC assessment is "based on all the relevant medical and other evidence in" the
record.  20 C.F.R. § 416.920(e).  A claimant's RFC "is the most [she] can still do despite
[her] limitations."  20 C.F.R. § 416.945(a)(1).

general public; interaction with supervisors and coworkers would be occasional and superficial interactions such that work is rated no lower than 8 on the people scale of Appendix B to the DOT, 1991 revised edition; would have the option to use a cane for stability when walking, so when walking the claimant could rely on a cane for stability, standing, or changing position without use of a cane.

(R. 18.)  Beginning on June 5, 2019, the ALJ found the Plaintiff's RFC changed to require the "use of a cane for any change of position standing or walking [and] a wheelchair that reclines if sitting more than 20 minutes."  (R. 36.)  In distinguishing between the two periods, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the objective and subjective medical evidence and with other relevant evidence of record prior to June 5, 2019, but consistent beginning on that date.  (R. 19-20, 36.)  The ALJ did not consider any medical provider or consultant opinion "on an issue reserved to the Commissioner" under 20 C.F.R. § 404.1520b(c)(3). Notwithstanding that limitation, the ALJ explained the weight given to each opinion and the reasons underlying that weight.  (R. 31-36.)

At step four, the ALJ determined that since September 2, 2017, Plaintiff could not perform her past relevant work as an associate marriage and family therapist, customer service representative, membership sales associate, summer camp counselor, residential treatment counselor, adjunct professor, lead staffer at a childcare business, personal care

assistant, and graduate research assistant.[4]  (R. 39-41.)  The ALJ thus proceeded to step

five of the sequential evaluation.  The ALJ determined Plaintiff, prior to June 5, 2019,

could not perform the full range of even sedentary work because nonexertional

limitations eroded the occupational base of unskilled work at all exertional levels.  (R.

41-42.)  However, based on the vocational expert's testimony, the ALJ determined

Plaintiff could make a successful adjustment to other widely available jobs such as

document preparer, semi-conductor bonder, and touch-up screener.  (R. 42.)

Accordingly, Plaintiff was found not disabled prior to June 5, 2019.  (R. 19.)  Finally, the

ALJ determined from June 5, 2019, onward, Plaintiff could perform no jobs in the

national economy.  (R. 42.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining

whether the decision complies with the relevant legal requirements and is supported by

substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Ford v. Astrue*, 518

F.3d 979, 981 (8th Cir. 2008).  "Legal error may be an error of procedure, the use of

erroneous legal standards, or an incorrect application of the law."  *Collins v. Astrue*, 648

F.3d 869, 871 (8th Cir. 2011).  Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*,

139 S. Ct. 1148, 1154 (2019) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)

---

[4] The term "past relevant work" means "work that you have done within the past 15
years, that was substantial gainful activity, and that lasted long enough for you to learn to
do it."  20 C.F.R. § 416.960(b)(1).

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard)).  This standard requires a court to consider not only evidence that supports the ALJ's decision but also evidence that detracts from it.  *See Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  The Court may not, however, reverse the ALJ's decision simply because "the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings," the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).   Put another way, "[t]he agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  *Nasrallah v. Barr,* 140 S. Ct. 1683, 1692 (2020) (describing the substantial evidence standard in the context of an immigration case).

## III.    Discussion

The Plaintiff argues the ALJ's determination that she was not disabled prior to June 5, 2019, is not supported by substantial evidence on four grounds.  First, Plaintiff argues, the ALJ failed to assess Plaintiff's migraines as a severe impairment at step two as well as a condition that meets a listing under step three.  (Pl.'s Mem. at 10-13.) Second, the ALJ should have determined that Plaintiff's EDS met or medically equaled the criteria for listing 1.02.  (*Id.* at 13-15.)  Third, the ALJ erred by refusing to assess or evaluate opinions from five medical sources on the ground that "if adopted, [the opinions] would direct a decision that the claimant is or is not disabled."  (*Id.* at 15-17.) Fourth, and finally, the ALJ erred in not including Plaintiff's reasonably anticipated

absenteeism or limitations on the use of her hands to perform fine motor activities into Plaintiff's RFC.  (*Id.* at 17-22.)

A.    **Whether the ALJ's Conclusions that Plaintiff's Migraines Were Not Severe or Medically Equal to Listing 11.02 Are Supported by Substantial Evidence**

Plaintiff argues that her migraines should have been considered severe at step two. The claimant bears the burden of proving disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  A claimant's medically determinable impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  The claimant must have a severe impairment or combination of impairments to be considered disabled.  *Id.*  Once the claimant crosses that threshold, all impairments, including those deemed non-severe, are considered when assessing whether the claimant's impairments meet or equal a listing, 20 C.F.R. § 404.1520(d), as well as in determining the claimant's RFC, 20 C.F.R. § 404.1545(a)(2).  Thus, the only reversible error possible at step two is a finding of not disabled; all other errors are harmless.  Here, the ALJ found Plaintiff had severe impairments, acknowledged that "the functional impact of all non-severe impairments receive consideration," and proceeded to step three. (R. 12-14.)  Thus, any error in determining Plaintiff's migraines were not a severe impairment at step two would be harmless.

On the other hand, if Plaintiff's migraines (singly or in combination with other impairments) meet or equal a listing, the Plaintiff must be found to be disabled.  20 C.F.R. § 404.1520(d).  To establish that an impairment or combination of impairments meets or equals a listing, a claimant must establish all of the listing's specified criteria.

13

*See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). If an impairment manifests only some of these criteria, no matter how severe, it does not qualify as a listed impairment. *Id.* To equal a listing, the impairment must be at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). "An ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017).

Plaintiff argues that her migraines should have been considered medically equal to subsections B or D of listing 11.02 (neurological disorders – epilepsy) under Social Security Ruling 19-4p. Subsection B of listing 11.02 describes dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. Subsection D describes dyscognitive seizures occurring at least one every two weeks for at least 3 consecutive months despite adherence to prescribed treatment and a marked limitation in at least one of five areas: 1) physical functioning; 2) understanding, remember, or applying information; 3) interacting with others; 4) concentrating, persisting, or maintaining pace; or 5) adapting or managing oneself. Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02.H.1.b.

Social Security Ruling 19-4p, which applied to Plaintiff's claims pending at the time of its promulgation, provided guidance on how to evaluate primary headache disorders such as migraines in disability claims. 2019 WL 4169635 (Aug. 26, 2019); *id.* at *8, n.27; *see also* 20 C.F.R. § 402.35(b)(1) (rulings are binding on ALJs). The Ruling

14

recognized that the most closely analogous listed impairment for the medically

determinable impairment of primary headache disorder is listing 11.02.  To evaluate

whether a primary headache disorder is equal in severity and duration to subsection B of

listing 11.02 under the Ruling, the ALJ should look to:

> a detailed description from an [acceptable medical source] of a typical headache
> event, including all associated phenomena (for example, premonitory symptoms,
> aura, duration, intensity, and accompanying symptoms); the frequency of
> headache events; adherence to prescribed treatment; side effects of treatment . . . ;
> and limitations in functioning that may be associated with the primary headache
> disorder or effects of its treatment, such as interference with activity during the
> day . . . .

2019 WL 4169635, at *7.  The ALJ considers the same factors when evaluating under

subsection D, and the ALJ also considers "whether the overall effects of the primary

headache disorder on functioning results in marked limitations" in the areas previously

described.  *Id.*

> The ALJ considered the Plaintiff's migraines at step two:

> The record documents the claimant to have a history of chronic migraine
> headaches ([R. 335]).  The claimant testified that she gets seven migraines a
> month and that she has to remain in a dark room for 30 minutes to eight hours
> after one begins.  The claimant has not alleged nor does the record support any
> significant increase in frequency or severity compared to the period before her
> alleged onset date.  Medication decreases the frequency by about 50% and works
> well for the claimant by report ([R. 1644, 1787-93]).  With consideration of Social
> Security Ruling (SSR) 19-4p, this impairment does not result in more than
> minimal work-related limitations based on the record.  The impairment is not
> severe.

(R. 14.)  The ALJ did not explicitly analyze whether Plaintiff's impairments met or

equaled listing 11.02 at step three, but that finding is implicit in the analysis above.

> The ALJ's implicit finding that Plaintiff's impairments for the time period

between September 2, 2017, and June 4, 2019, do not equal listing 11.02 is supported by substantial evidence. Since childhood—including the time period during which she worked several active jobs at the same time (R. 302)[5]—Plaintiff suffered daily headaches. (R. 1179, 1519.) Dr. Sencakova prescribed Depakote on April 17, 2017. (*Id.*) With Depakote, her migraines lessened (R. 1242), but she still claimed headaches that lasted more than four hours more than fifteen days a month (R. 1201-02). An MRI on May 2, 2017, did not reveal anything unusual. (R. 1222.) Plaintiff discussed Botox injections in May (R. 1222) and received her first injection on August 11, 2017 (R. 2950.) For acute treatment, Plaintiff used a migranal nasal spray. (R. 2956.) On November 29, 2017, Plaintiff reported that "Botox has been working well at controlling her migraines." (R. 1787.) She repeatedly reported that "Botox has been extremely helpful for her" and that "[w]ith Botox therapy, headaches have decreased to 5-10 days per month." (R. 1645, 2917-18, 2935, 2950; *see also* R. 2664 (noting notable and ongoing improvements in the headache disability index).) Plaintiff testified that each migraine lasted between thirty minutes and eight hours. (R. 94.) Even with medication, Plaintiff claimed that she had to lie down in a dark room without noise during intense migraines. (R. 93-95.) However, the ALJ concluded that the Plaintiff's claims about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the evidence. (R. 20, 31.)

---

[5] *See, e.g., Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (upholding ALJ's decision discounting claimant's complaints of disabling pain where claimant worked for several years despite complaining of that pain). "Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work." *Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007).

Missing from the voluminous record is "a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena," that correlates with Plaintiff's claims of severity.  Plaintiff does not point to a single medical appointment complicated, interrupted, or canceled due to Plaintiff's allegedly frequent, debilitating, and long-lasting migraines.  Few appointment notes mentioned Plaintiff's migraines (*e.g.*, R. 1617, 2114, 2664), and even fewer addressed them directly (*e.g.*, R. 1179, 1545, 2950).  Even if Plaintiff could show that the migraines occurred with sufficient frequency to equal listing 11.02, she could not carry her burden of showing the headaches were sufficiently severe.  *See David S. v. Saul*, Case No. 19-cv-3137 (ADM/LIB), 2021 WL 467348, at *5-6 (D. Minn. Jan. 25, 2021) (upholding ALJ where Plaintiff failed to provide medical evidence demonstrating severe and frequent headaches under SSR 19-4p and listing 11.02), *adopted*, 2021 WL 565281 (D. Minn. Feb. 9, 2021). Accordingly, the Court finds substantial evidence supports the ALJ's finding that Plaintiff's migraines are not severe and not medically equal to listing 11.02.

### B.    Whether the ALJ's Conclusion that Plaintiff's EDS Did Not Meet or Medically Equal Listing 1.02 Is Supported by Substantial Evidence

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's EDS under listing 1.02(a) for the time period prior to June 5, 2019.  Listing 1.02(a) has five elements: (1) a showing of an anatomical deformity, characterized by symptoms including subluxation and instability; (2) chronic joint pain and stiffness with limitation of motion or other abnormal motion of those joints; (3) imaging revealing joint space narrowing, body destruction, or ankylosis of the affected joints; (4) involvement of at

17

least one major weight-bearing joint, including hips, knees, or ankles; and (5) an inability

to ambulate effectively.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02(a).  "Inability to

ambulate effectively means an extreme limitation of the ability to walk."  20 C.F.R. pt.

404, subpt. P, app. 1, § 1.00.B.2.b.1.  "To ambulate effectively, individuals must be

capable of sustaining a reasonable walking pace over a sufficient distance to be able to

carry out activities of daily living." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00.B.2.b.2.

Examples of ineffective ambulation include

> the inability to walk without the use of a walker, two crutches or two canes, the
> inability to walk a block at a reasonable pace on rough or uneven surfaces, the
> inability to use standard public transportation, the inability to carry out routine
> ambulatory activities, such as shopping and banking, and the inability to climb a
> few steps at a reasonable pace with the use of a single hand rail. *The ability to
> walk independently about one's home without the use of assistive devices does not,
> in and of itself, constitute effective ambulation*.

*Id.* (emphasis added).

In his decision, the ALJ specifically addressed listing 1.02.  After recounting the

criteria to meet listing 1.02, describing Plaintiff's fibromyalgia, and acknowledging

guidance in Social Security Ruling 12-2p, 2012 WL 3104869 (July 25, 2012), the ALJ

concluded "[t]he claimant does not meet this listing prior to June 5, 2019, because she

was able to ambulate independently, with occasional use of a single end cane for

stability. . . . The claimant has not demonstrated inability to ambulate effectively . . . ."

The entire decision was based on the fifth criteria of listing 1.02.[6]

Rather than point to record evidence of Plaintiff's inability to ambulate, Plaintiff

---

[6] For these reasons, Plaintiff's and the Commissioner's arguments about whether
Plaintiff's impairments met or medically equaled the other criteria are largely irrelevant.

argues that the "ALJ's failure to meaningfully document how the evidence fell short of the 1.02 standard means there is insufficient evidence for this court to meaningfully review whether or not [Plaintiff] met the listing." The Court disagrees. First, Plaintiff bears the burden of proving her impairments satisfied all criteria of a medical listing. *See Johnson*, 390 F.3d at 1070. Second, "a statement that the individual's impairment(s) does not medically equal a listed impairment [generally] constitutes sufficient articulation for this finding." SSR 17-2p, 2017 WL 3928306, at *4 (Mar. 27, 2017). Ordinarily, the evidence previously submitted, or the analysis of why the individual is not disabled at a later step provides the rationale. *Id.* As a result, even if the ALJ does not explain his step three finding, there is no reason for remand so long as the record supports his overall conclusion. *See Igo v. Colvin*, 839 F.3d 724, 728-29 (8th Cir. 2016).

The fact that Plaintiff could ambulate effectively with the use of a single-end cane prior to June 5, 2019, is supported by substantial evidence. Plaintiff initially reported that she used a cane in public and at home for stairs and that she could walk less than a city block before needing to rest. (R. 306, 308, 310, 322, 324.) In December 2018, Plaintiff claimed she could no longer stand with straight legs because her knees would hyperextend. (R. 353.) But the ALJ discounted Plaintiff's claims about the intensity, persistence, and limiting effects of her symptoms because it was inconsistent with evidence showing "variability and no need for assistive device except as an option for stability when walking, standing, or changing position." (R. 20.) Contrary to Plaintiff's claims that the ALJ's failed to explain why Plaintiff did not meet listing 1.02, the decision itself provides a complete picture of Plaintiff's deteriorating ability to ambulate

prior to June 5, 2019:

- "In August 2017 . . . [claimant] denied . . . gait disturbance." (R. 21, citing R. 1300.)
- "In October 2017 . . . [g]ait was normal." (R. 22, citing R. 1773-79.)
- "In November 2017, the claimant reported to her physical therapist that she could only be up for 5-10 minutes at a time. She reported going up and down a flight of stairs in her sister's house 5-8 times per day. She reported going out of the house every 1-2 weeks for appointments or necessary task." (R. 22, citing R. 1357.)
- "On November 29, 2017 . . . the claimant had normal gait." (R. 22, citing R. 1787-93.)
- "The claimant does present at times with a cane or in a wheelchair ([R. 1655-58, 1663-1912]). Dr. Will endorses that device and a cane for stability and chronic pain as of November 2019 ([R. 3200, 3278]). . . . She has been observed with normal gait and active range of motion despite use of cane ([R. 3284]). Elsewhere the claimant has no mention of cane use and has normal strength, no acute distress, and normal pulses despite antalgic gait ([R. 3302])." (R. 23.)
- "In December 2017, the claimant reported to her physical therapist that her legs felt like bricks after going up the flight of stairs at her sister's place." (R. 23, citing R. 1372.)
- "In February 2018, the claimant walked with a cane at an office visit." (R. 24, citing R. 1680.)
- "In February and March 2018 . . . [t]he claimant used a cane." (R. 24, citing R. 1519-40.)
- "On March 9, 2018, the claimant had an orthopedic consultation. The examining doctor noted pain behaviors with mobility and that the claimant lay prone for the majority of the visit, arriving in a wheelchair and alleging that she was "unable to stand" for any length of time. The claimant used a single end cane for limited ambulation in the exam room." (R. 24, citing R. 1639-41, 1649.)
- "On June 4, 2018 . . . [t]he claimant's gait was mildly antalgic . . . The patient had significant tremors when standing on her right leg alone. . . . Passive straight leg raising was negative bilaterally. Active straight leg raising was easier on the right with both anterior and posterior pelvic compression and harder on the left with both anterior and posterior compression. Lower extremity motor testing revealed severe inhibition of the gluteus maximus muscles during prone hip extension and moderately severe inhibition of the left gluteus medius during hip abduction. . . . Lower extremity sensory exam revealed hyperesthesia over the later aspect of the right calf and the tops of both feet. . . . Dr. Sandness concluded that the claimant had pelvic instability, thoracic outlet syndrome, pudendal neuralgia, ligament laxity, bone pain, sleep disturbances, hyperesthesia, muscle spasms, and somatic dysfunctions of the pelvis, sacrum, thorax, ribcage, and lower extremities." (R. 25, citing R. 1659-62.)

- "In July 2018, on routine exam, the findings were negative except that the claimant appeared tired and used a wheelchair." (R. 25, citing R. 2128.)
- "The claimant reported to the emergency department on August 7, 2018 due to right hip pain." (R. 26, citing R. 2627-28.)
- "In August 2018, the claimant was examined for a functional capacity assessment ([R. 2229-34, 2480-86]). . . . [The evaluating occupational therapist] reported that the claimant had a slow, compensating gait, leaning on a single end cane with upright posture, but hypermobility/instability and slow functional patterns of coordination. She noted that the claimant had compensating movement patterns and spasm/shakiness/fatigue in the lower extremity. Other than the right lower extremity, the claimant had range of motion within functional limits and full strength (5/5). However, muscular endurance testing was poor, there was swelling in both feet . . . and she had moderate deficit in balance testing one leg and severe deficit in balance testing on foam." (R. 26.)
- "The claimant went to the emergency department for chronic hip pain on October 16, 2018. On exam, the claimant had no signs of acute injury or deformity. There was no peripheral edema. The claimant ambulated independently." (R. 26, citing R. 2617-26.)
- "On December 6, 2018, . . . [the claimant] was able to walk with a guarded gait." (R. 26, citing R. 3338-45.)
- "At the December 17, 2018, pain visit, . . . [the claimant] had normal gait." (R. 27, citing R. 3048, 3053.)
- "In December 2018, the claimant reported that she was going on vacation and would be back on January 8 ([R. 3172]). She reported that she used a wheelchair for long distances and had a cane. She also alleged that she had atrophy from being in bed, though examining doctors, nurses, and physician assistants have not noted specific atrophy ([R. 3146])." (R. 27.)
- "On February 11, 2018, the claimant [sic] received an orthopedic evaluation of her right hip pain. . . . The claimant's gait was severely antalgic and she nearly collapsed. The claimant's leg's had severe tremors/shaking with all four resisted motions and that lasted for 15-30 seconds after ceasing the resisted exercise." (R. 27, citing R. 2923-31.)
- "On February 22, 2019, the claimant reported to her physical therapist that there were fewer stairs to manage at her father's place than when she lived at her sister's place ([R. 2661])." (R. 27.)
- "On March 19, 2019, . . . the doctor noted the claimant to be reclining in a wheelchair and accompanied by her father." (R. 27, citing R. 2585-88.)
- "On May 3, 2019, the claimant's knee received examination. X-rays that day were normal. The exam was normal. Her knee appeared normal and had no atrophy, deformity, or swelling. Range of motion was full as was strength. . . . Sensation was present, gait was stable . . . The doctor concluded the knee pain was likely due

to deconditioning[7] ([R. 2938-46]).” (R. 28.)

- “The claimant went to the emergency department for leg pain on May 12, 2019, being concerned she could have deep venous thrombosis as her dad has had it. Venous ultrasounds results were negative for deep venous thrombosis. The claimant refused to leave without narcotic pain medication. Though the emergency medical doctor did not see a need for it, he noted that he was sympathetic and gave her one dose of morphine.” (R. 28, citing R. 2589-94 .)

- “On May 30, 2019, the claimant saw another orthopedist. The claimant presented in a reclining wheelchair with her father. . . . On exam of the right hip, the claimant’s circulatory, motor, and sensation were intact. Other systems were also intact. . . . also noting deconditioning.” (R. 28, citing R. 2678-80.)

After reviewing this extensive history, the ALJ concluded that

> Prior to June 5, 2019, the claimant did not require a cane more than as optional for stability as seen by the fact that she did not always appear with an assistive device at medical appointments. There was no statement of medical need for a reclining wheelchair until after that date. The objective medical findings prior to that date support that the claimant had ability to function at a greater level than alleged.

(R. 28.) The Plaintiff does not challenge the ALJ’s recitation of the relevant medical history, nor the ALJ’s finding regarding Plaintiff’s credibility. Substantial evidence supports the ALJ’s findings, and the Court will not reweigh the evidence regarding Plaintiff’s ability to ambulate. *See Igo*, 839 F.3d at 729-30 (upholding ALJ’s conclusion that claimant did not suffer from an inability to ambulate effectively and allegations to the contrary were undermined by the evidence in the record).

---

[7] Deconditioning is a physical or psychological decline in function due to prolonged inactivity. Deconditioning, *Encyclopedia.com*, https://www.encyclopedia.com/education/encyclopedias-almanacs-transcripts-and-maps/deconditioning (last visited Jan. 24, 2022); Deconditioning, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/deconditioning (last visited Jan. 24, 2022).

**C.    Whether the ALJ Erred as a Matter of Law by not Considering
      Certain Medical Opinions**

Plaintiff argues the ALJ failed to consider every medical opinion under 20 C.F.R.

§ 404.1520c.  Many of Plaintiff's medical sources opined, as part of their analysis, that

Plaintiff is incapable of work or disabled.  (*See, e.g.*, R. 896-99, 902, 906-07, 908, 1535-

37, 2090, 2236, 2239-40, 2243-45.)   According to Plaintiff, the regulations require the

ALJ to evaluate these opinions to determine whether such findings are entitled to

controlling weight, citing *Robert B. v. Saul*, No. 20-cv-424 (MSK/DTS), 2021 WL

931244 (D. Minn. Mar. 11, 2021), *Greiner v. Colvin*, No. 4:15-cv-1509 DDN, 2017 WL

227965 (E.D. Mo. Jan. 19, 2017), and *Reed v. Saul*, 481 F. Supp. 3d 877 (D. Minn.

2020).

All of Plaintiff's cases concern cases filed before March 27, 2017.  For claims

filed on or after March 27, 2017, ALJs will not provide any analysis of certain evidence,

including "statements on issues reserved to the Commissioner [that] would direct [the

ALJ's] determination or decision that [the claimant is or is not] disabled."  20 C.F.R. §

404.1520b(c)(3).  If the ALJ was not previously empowered to discount a medical

source's opinion on an issue reserved to the Commissioner previously, the regulations

plainly provide that authority now.  As a result, the ALJ did not err in explicitly declining

to analyze opinions subject to that regulation.  (R. 32-34, 38-39.)

**D.    Whether the ALJ's Erred in Concluding Plaintiff's RFC Did not
      Include Absenteeism or Limits on Use of Hands for Fine Motor Skills**

A claimant's RFC represents the most she can do despite the combined effects of

all of her limitations, severe and non-severe.  20 C.F.R. § 416.945(a), (e).  The RFC

23

assessment is "based on all the relevant medical and other evidence" in the record.    The claimant bears the burden of establishing her RFC.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir 2004).  The claimant's RFC must be supported by some medical evidence.  *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam).  That medical evidence should address the claimant's ability to function in the workplace, *see Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003), and "perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).  The RFC must include only those impairments that are substantially supported by the record as a whole.  *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).  Plaintiff faults the ALJ for not including a limitation based on absenteeism or the use of hands for fine motor skills, which, per the testimony of the vocational expert, would have rendered Plaintiff unable to engage in competitive employment.

### 1.    Plaintiff's Absenteeism

Plaintiff emphasizes that she has multiple impairments that cause significant fatigue and acute pain episodes that occur at unpredictable times, such as fibromyalgia, chronic fatigue syndrome, EDS, and migraines.  (Pl.'s Mem. at 18.)  These unpredictable impairments, coupled with the need to attend doctor appoints twice a week,[8] interfere with Plaintiff's ability to "meet the physical, mental, sensory, and other requirements of work" on a sustained basis.  20 C.F.R. § 416.945(a)(4).

---

[8] Plaintiff estimated she had a total of 115 medical visits in 2018, which corresponds to two appointments a week.  (R. 403.)

Plaintiff's medical appointments are not sufficient grounds for including an absenteeism limitation. "Courts have reasoned that 'simply because a claimant requires regular healthcare appointments does not necessarily mean [she] cannot work on the days [she] has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the claimant would need to miss an entire day for an appointment.'" *Brown v. Comm'r*, No. 18-cv-3071, 2020 WL 3120350, at *7 (N.D. Iowa Feb. 25, 2020) (quoting *Morin v. Colvin*, No. 4:14-cv-769, 2015 WL 4928461, at *9-10 (W.D. Mo. Aug. 18, 2015); *see also Barnett v.* Apfel, 231 F.3d 687, 691 (8th Cir. 2000) (argument based on how many days claimant would have missed from work based on medical record is faulty); *Jason P. P. v. Kijakazi*, Case No. 20-cv-688 (TNL), 2021 WL 4483040, at *16 (D. Minn. Sept. 30, 2021) (rejecting claim of disability based on frequency of medical appointments). Plaintiff has not met her burden of showing that her medical treatment from September 2017 to June 5, 2019, necessarily conflicted with a consistent work schedule. *See Jason P. P.*, 2021 WL 4483040, at *16.

Adding Plaintiff's unpredictable medical impairments presents a closer question. The ALJ reasoned that Plaintiff's migraines did not interfere with her performance of gainful activity. The ALJ found Plaintiff was not credible when describing the severity of her migraines, and she was able to work since the onset of that impairment. (R. 14, 31.) And, for the reasons stated above, the Court did not find any error in that assessment.

Plaintiff additionally argues her chronic fatigue syndrome and fibromyalgia support an absenteeism limitation. *See, e.g.*, *Robinson v. Astrue*, Case No. 08-cv-694

(DSD/JJK), 2009 WL 943856, at *13 (holding ALJ erred in discounting opinions supporting claimant's likely absenteeism where medical records included lupus, fibromyalgia, and chronic pain syndrome), *adopted*, 2009 WL 1580258 (D. Minn. June 4, 2009); *Joe v. Colvin*, Case No. 11-cv-4147-KES, 2014 WL 3817225, at *3 (D.S.D. Aug. 4, 2014) (history of missing workdays from chronic fatigue syndrome); *Danissa v. Comm'r*, No. 2:19-cv-1993-BAT, 2020 WL 3264134 (W.D. Wa. June 17, 2020) (medical source supported finding of debilitating fatigue that leads to absenteeism). But Plaintiff's argument would require an ALJ addressing a medically determinable impairment of fibromyalgia or chronic fatigue syndrome to—automatically and in every instance— consider absenteeism in determining a claimant's RFC. Rather, Plaintiff bears the burden of proving her RFC, and she points to no medical opinion in her record supporting a limitation of absenteeism from work attributable to these conditions. (*See* R. 2230 (no absenteeism limit in functional capacity evaluation), R. 3372-78 (no absenteeism limit in medical source statement). *Compare Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998) (discussing treating physician's opinion that claimant would miss work frequently, consistent with earlier report of another physician regarding work-related limitations). Without record evidence supporting *excessive* absenteeism, the ALJ did not err in omitting absenteeism from Plaintiff's RFC limitations.

### 2.    Plaintiff's Use of Hands for Fine Motor Skills Such as Handling, Fingering or Feeling

Plaintiff argues that the ALJ erred by omitting any limitation in Plaintiff's RFC relating to the frequency with which Plaintiff could use her hands or fingers. Plaintiff

reported her pain in her hands, arms, and wrists in her initial application for benefits. (R. 302, 305, 310.) She alleged she could no longer maintain small motor actions such as writing or typing. (R. 302, 310.) She could no longer chop food or open cabinets or jars. (R. 305.) Although she enjoyed reading on her ebook and playing smart phone games, she would have to stop if she had hand or arm pain while holding the device. (R. 307.) At the hearing, Plaintiff offered testimony about the pain and limitations she experienced in the use of her hands and fingers. (R. 84, 87.) Plaintiff explained how her silver splint and rings brace the joints in her hands to prevent hypermobility. (R. 83-85.) When questioned by her attorney about her ability to handle, finger, and feel, Plaintiff testified to being able to use her phone most days, depending on the level of exertion that day. (R. 86-87.) As explained above, the ALJ discounted to some extent Plaintiff's statements regarding the limiting effects of her physical impairments because they were inconsistent with the medical record. (R. 20.)

In January 2017, her initial evaluation for treatment by a pain specialist remarked that Plaintiff had moderate pain in her hands with motion. (R. 672.) In October 2017, detailed exam findings included a finding of active, pain-free range of motion to elbows with normal strength in hands. (R. 1777.) In early 2018, Dr. Nathan B. Holladay observed that Plaintiff's fingers and elbows could hyperextend and marked Plaintiff's complaints of dropping things. (R. 1523, 1526, 1531.) In August 2018, the Plaintiff reported that her hands get tired and sore very easily, such as when she is typing or texting on her phone for twenty minutes. (R. 335.) That same month, an evaluating occupational therapist noted mild deficit in grip strength and 3-point pinch, as well as

significant deficit in lateral pinch.  (R. 2230, 2482-83.)   Plaintiff reported numbness and tingling in her hands.  (*Id.*)  By December of that year, Plaintiff claimed her hands were hyperextending and subluxing more often, causing her fingers to become partially dislocated when she attempted to cut her own food with a knife.  (R. 353.)  Dr. Shanda Dorff, an EDS specialist, noted that Plaintiff had 4/5 grip strength and recommended custom ring splints.  (R. 3341-42.)  Plaintiff stated she would begin hand therapy in January of 2019.  (R. 3048; *but see* R. 407 (disclaiming hand therapy).)  She obtained her silver ring splints in May 2019.  (R. 2948-49.)

A Social Security Ruling explains how limits on a claimant's reaching, handling, fingering, and feeling impact employability:

> c. *Reaching, handling, fingering, and feeling* require progressively finer usage of the upper extremities to perform work-related activities. Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations. "Fingering" involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion. As a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required--as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work. The varying degrees of loss which can occur may require a decision-maker to have the assistance of a VS. However, a VS would not ordinarily be required where a person has a loss of ability to feel the size, shape, temperature, or texture of an object by the finger-tips, since this is a function required in very few jobs.

SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857, at *7 (1985).

From September 2, 2017, through June 4, 2019, Plaintiff complained increasingly frequently about the use of her hands. But, as described previously, the ALJ did not find Plaintiff entirely credible, and Plaintiff does not challenge that assessment. The objective evidence of any functional impairment is scant. Plaintiff's grip strength—which speaks to Plaintiff's ability to handle—only suffered a mild deficit through December 2018. (R. 3341.) The ALJ discounted medical opinions related to Plaintiff's lateral pinch strength—which would speak to Plaintiff's ability to finger—because they were not based on objective testing. (R. 26.)[9] In fact, Plaintiff points to no medical opinion during the relevant time period[10] expressing functional limitations on Plaintiff's use of her hands based on objective medical evidence. *See Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 730 (8th Cir. 2003) (holding that mere diagnosis of an impairment does not establish that the impairment results in a particular functional limitation). To the contrary, Dr. Thomas Lange, the medical consultant responsible for the reconsideration decision, reviewed the evidence as of September 2018 and concluded Plaintiff had no limitations in manipulation. (R. 160-62.) The ALJ found Dr. Lange's opinion partially persuasive but included additional limitations to address Plaintiff's EDS and other impairments diagnosed after September 2018. (R. 31.) *See Deanna T. v. Kijakazi*, Case No. 20-cv-

---

[9] Under 20 C.F.R. § 404.1520c, the ALJ may properly discount the opinion of a medical source so long as he articulates his reasoning. A lack of objective testing speaks to the opinion's supportability. 20 C.F.R. § 404.1520c(c)(1).

[10] After the time period in dispute, Carrie Overbeke, C.N.P., provided an opinion, co-signed by Dr. Andrew Will—that Plaintiff could only occasionally handle, finger, and feel. (R. 3375.) However, the basis for the limitation was Plaintiff's self-report as opposed to any objective testing. (*Id.*)

576 (ECW), 2021 WL 3620172, at *21 (D. Minn. Aug. 16, 2021) (rejecting argument that ALJ "played doctor" when limitation in handling, fingering, and feeling was based on medical consultant's opinion but reversing to the extent ALJ failed to develop record further); *see also Winn v. Comm'r*, 894 F.3d 982, 987 (8th Cir. 2018) (holding ALJ did not err in not including greater manipulative limitation where unsupported by record). Because the record does not support limitations in hand use from September 2, 2017, to June 5, 2019, beyond what the ALJ included in his RFC assessment, the Court finds no error in the ALJ's omission of a limit on Plaintiff's fine motor skills.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [ECF No. 26] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [ECF No. 31] be **GRANTED**;

3.    Judgment be entered accordingly.

Dated: January 27, 2022

*/s Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

### NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and

responses must comply with the word or line limits set forth in LR 72.2(c).